DECISION
This matter is before the Court on Bank Rhode Island's (hereinafter "Bank RI") motion for summary judgment as to Counts III, IV, and V of the Verified Complaint filed by Gillette of Kingston, Inc. (hereinafter "GKI") and Timothy J. Gillette (hereinafter "Gillette") (collectively "Borrowers").[1] The claims in issue are: (a) Count III, violation of the Equal Credit Opportunities Act (ECOA or Act), 15 U.S.C. § 1691 (2006) etseq., and Federal Reserve Regulation B, 12 C.F.R. § 202 (2006); (b) Count IV, illegal retaliation in violation of the ECOA; and (c) Count V, breach of the implied covenant of good faith and fair dealing.
 Facts and Travel[2]
On April 22, 2003, a Master Loan Agreement (hereinafter "Agreement") was entered into by and between Timothy J. Gillette and GKI, the Borrowers, and Bank RI, the Lender. In connection with this transaction, the Borrowers dealt directly with James P. Tiernan (hereinafter "Tiernan"), a Senior Vice President at Bank RI. The Agreement provided for a term loan in the amount of $800,000 and a line of credit in the amount of $100,000. The purpose of the loan was to refinance existing indebtedness and to expand GKI's available line of credit to better withstand seasonal fluctuations in sales. The loans were secured, in part, by security interests in GKI's assets, and with mortgage deeds on property located in Exeter and South Kingstown. On or about September 10, 2003, Gillette borrowed an additional $75,000 from Bank RI in connection with the construction of a residence on the Exeter property.
The Borrowers allege that Tiernan exercised substantial control over the disbursements of loan proceeds. Tiernan instructed the Borrowers to use some of the loan proceeds to make payments on a subordinated loan with Ocean State Business Development Authority, as well as to use $50,000 of the line of credit towards Gillette's divorce settlement. Gillette alleges that the pressures of the divorce and Tiernan's control over the funds left him with no other option than to do what Tiernan demanded. The Borrowers contend that as a result of applying the loan proceeds in the manner required by Bank RI, cash-flow was impaired. In response, Gillette approached Tiernan in November 2004 to request additional business financing in the amount of $150,000. Tiernan instructed Gillette that he would work on it, but he did not know if he would be able to obtain the entire request. As a result, GKI faced continuing problems with vendors, and Gillette repeatedly contacted Tiernan to inquire as to the status of the credit request. Tiernan reiterated that he was working on it and over a period of time requested various interim financials from GKI. In February 2005, Tiernan informed the Borrowers that Bank RI was unable to extend any additional credit.
On July 25, 2005, the Borrowers, through counsel, sent a letter to Bank RI giving notice of their claims that Bank RI had violated the ECOA, 15 U.S.C. § 1691 et seq., and Federal Reserve Regulation B, 12 C.F.R. § 202.[3] The Borrowers allege that on August 2, 2005, Bank RI retaliated by: demanding payment in full of the unpaid balance and all accrued interest on the line of credit; declaring defaults under the $800,000 and the $75,000 loans; accelerating and demanding payment in full of the unpaid balance and accrued interest on said loans; and threatening to commence foreclosure proceedings against the Exeter and South Kingstown properties if Plaintiffs' indebtedness was not repaid in full by September 6, 2005. After acceleration, demand and the scheduling of mortgage foreclosure, it is further alleged that Bank RI refused the Borrowers' reasonable request for forbearance to permit them to complete arrangements for take-out financing. As of August 2, 2005, the Borrowers were current on monthly payments of principal and interest on all loans. Bank RI defends its actions as justified and reasonable in light of GKI's financial statements as of year end 2004 evidencing breaches of the Minimum Debt Service Coverage and Tangible Net Worth covenants in the Agreement. Said breaches, Bank RI contends, constitute events of default under the Agreement, justifying acceleration and demand of all indebtedness due from the Borrowers.[4]
 Standard of Review
"As a prerequisite to an order for summary judgment, the lower court must review the pleadings, affidavits, admissions, answers to interrogatories, and other appropriate evidence from a perspective most favorable to the party opposing the motion."Gliottone v. Ethier, 870 A.2d 1022, 1027 (R.I. 2005) (citingSteinberg v. State, 427 A.2d 338, 340 (R.I. 1981)). After viewing the facts in the light most favorable to the nonmoving party, if the moving party can show, as a matter of law, that the plaintiff is unable to support its claims, only then can the Court grant the defendant's motion for summary judgment. Ludwigv. Kowal, 419 A.2d 297, 301 (R.I. 1980) (quoting Belanger v.Silva, 114 R.I. 266, 267, 331 A.2d 403, 404 (R.I. 1975)) (in denying a motion for summary judgment, "it is the province of the trial justice to determine, by an examination of the pleadings, depositions, answers to interrogatories, admissions on file, and the affidavits of the parties," whether there exists a genuine issue of material fact, and if not, whether the moving party is entitled to judgment as a matter of law). Super. R. Civ. P. 56.
The nonmoving party bears the burden of demonstrating by competent evidence the existence of a disputed issue of material fact and cannot rest on allegations or denials in the pleadings, mere conclusions, or legal opinions. DeSantis v. Prelle,891 A.2d 873 (R.I. 2006) (quoting Lucier v. Impact Recreation,Ltd., 864 A.2d 635, 638 (R.I. 2005)). The United States Supreme Court has noted that, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." HordCorp. v. Polymer Research Corp. of Am., 275 F. Supp.2d 229, 234
(D.R.I. 2003) (quoting Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510 (1936)).
 Analysis
Violation of the Equal Credit Opportunities Act and RegulationB.
Count III of the Verified Complaint claims that Bank RI failed to provide "timely notice of adverse action" in connection with the Plaintiffs' November 2004 request for additional business financing or "timely notice of the specific reasons for any such adverse action," alleging such failure to constitute a violation of the ECOA and Regulation B. Under both the statute and the regulations, a creditor must notify an applicant of action taken after receiving a completed application.[5] See15 U.S.C. § 1691(d)(1) and 12 C.F.R. § 202.9(a)(i). According to Gillette's deposition, the application process was on-going and included telephone conversations and multiple requests for interim financials for the months preceding and following the November 2004 request. Such financial information was used in assessing the additional financing request. Therefore, while the date of a completed application has not been agreed to, for purposes of this motion it appears undisputed that an application was not "complete," as defined by the regulations, prior to January 2005.[6]
The statutory language of 15 U.S.C § 1691(d)(1) expressly provides that "[w]ithin thirty days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application." However, the statute further provides that the term "adverse action" does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit. See 15 U.S.C. § 1691(d)(6). Additionally, the definition of "adverse action" under 12 C.F.R. § 202.2 excludes, "any action or forbearance relating to an account taken in connection with inactivity, default or delinquency as to that account." See12 C.F.R. § 202.2(c)(2)(ii).
The statutory language grants authority to the Board to specify a longer notification period under the regulations for any class of credit transaction. Accordingly, 12 C.F.R. § 202.9(a)(3)(ii) specifically governs the notification procedure for business credit applicants[7] in businesses with gross revenues in excess of $1 million.[8] Under this section, a creditor shall:
 (A) Notify the applicant, within a reasonable time,
orally or in writing, of the action taken; and
 (B) Provide a written statement of the reasons for the adverse action and the ECOA notice specified in paragraph (b)(1) of this section if the applicant makes a written request for the reasons within 60 days of the creditor's notification.[9]
(Emphasis added.)
This Court finds as a matter of law that Bank RI did not violate the ECOA thirty day notice requirement for adverse action taken with regard to the Borrowers' request for additional financing. The statute expressly provides that the term "adverse action" does not include refusals to extend credit under anexisting credit arrangement where the applicant is in default, or where such additional credit would exceed a previously established credit limit. See 15 U.S.C. § 1691(d)(6) and12 C.F.R. § 202.2(c)(2)(ii).
Under the facts of this case, an existing credit relationship and arrangement existed between the parties as is evidenced from the loan agreements, the line of credit, the Borrowers' oral request for additional financing, the ongoing dialogue between the parties regarding the additional financing, and the continued filing of financial statements pursuant to the existing agreements. Accordingly, the existing credit relationship between the Borrowers and Bank RI serves to exempt Bank RI from the notification procedures as required for an "adverse action."[10]
This Court also finds that as a matter of law the Borrowers qualified as a business credit applicant, and the applicable notification requirement under the regulations is that a business credit applicant must be notified of the action taken within areasonable time, not within thirty days. See12 C.F.R. § 202.9(a)(3)(ii) (Emphasis added.)
In Williams v. Mid-Amer. Fed. Sav. and Loan Assoc.,624 F. Supp. 160 (S.D. Ohio 1985), the court held that when a transaction involves business credit, compliance with the notification procedures of 12 C.F.R. § 202.9 is not required; however, written or oral notification to an applicant is required, and a creditor must provide such within a "reasonable" time of its decision to deny credit. The court further noted that whether the defendants' oral notification to the plaintiff was given within a reasonable time was a genuine issue of material fact to be submitted to the jury. Id. at 161.
Accordingly, the only remaining viable issue as to Count III of the Verified Complaint is whether the Bank notified the Borrowers within a reasonable time of the action it took with regard to the November 2004 request for additional financing. Because the reasonableness of the timing of that response, as well as whether an application was made and when it was completed, are questions for the jury, summary judgment must be denied. However, as a matter of law, the Court finds that the claims in Count III must be limited exclusively to the question of whether Bank RI acted contrary to the provisions of 12 C.F.R. § 202.9(a)(3)(ii) in failing to notify the applicant within a reasonable time, orally or in writing, of the action taken on the request.
This Court finds that Bank RI did not violate the ECOA or Regulation B with regard to the thirty day notification requirement for an "adverse action" because both the Borrowers' existing credit relationship with Bank RI and the Borrowers' status as a business credit applicant serve to exempt Bank RI from that requirement.
Illegal Retaliation in Violation of Equal Credit OpportunitiesAct and Regulation B.
Within Count IV of the Verified Complaint, the Borrowers have alleged that they engaged in a statutorily protected activity by asserting rights under the ECOA and Regulation B, and that Bank RI's declaration of default, acceleration, demand for payment in full, and threat to foreclose constituted adverse credit actions against the Borrowers, in violation of the statute. See
Verified Complaint, Count IV, ¶ 50-51.
Title 15 U.S.C. § 1691(a)(3) provides, "[I]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction — because the applicant has in good faith exercised any right under the Consumer Credit Protection Act."[11] If the statute is clear and unambiguous, the Court must enforce it as written by giving the words of the statute their plain and ordinary meaning.Ruggiero v. City of Providence, 893 A.2d 235 (R.I. 2006). The plain and unambiguous language of the applicable section of the ECOA reveals that the Act pertains only to creditors' actions with regard to approval/denial of an application for credit.
The plain and ordinary language of the Act does not extend to creditors' decisions to declare default and demand acceleration and payment on a preexisting loan. Bank RI denied the Borrowers' business financing request as of February 2005, prior to any claim of an ECOA violation. Therefore, on August 2, 2005, when Bank RI made demand on the loan, the Borrowers were no longer an "applicant" for the purposes of the ECOA.
In support of its retaliation argument, the Plaintiffs cite toHaynie v. Veneman, 272 F. Supp.2d 10 (D.D.C. 2003), arguing that the breadth of the statutory language prohibits discrimination "with respect to any aspect of a credit transaction," including any subsequent decisions surrounding an application for credit. Id. at 18. While this Court acknowledges that statutorily proscribed discrimination may extend to actions taken beyond the creditor's denial of a credit request, the District Court further explained that "any aspect of a credit transaction" is intended to prohibit discrimination with respect to those acts surrounding an application for credit that materially affect the applicant's ability to obtain the desiredcredit. Id. at 21 (Emphasis added.) The Haynie Court explicitly stated that "ECOA does not create an all encompassing scheme to regulate all relations between lenders and their potential customers." Id. Rather, the Act specifically pertains to applications for credit; it is not to be read as including a creditors' decision to demand payment on a preexisting loan unrelated to an application for additional financing.[12]
Admittedly, Bank RI included among the reasons for downgrading its existing credit relationship with the Borrowers the "[B]ank's receipt of letter from Attorney Little." Plaintiffs suggest that such a rationale is further evidence of a retaliatory intent. Once again, however, the ECOA retaliation provisions are limited to discrimination with respect to an applicant's efforts to obtain credit, not the actions of a lender with regard to declarations of default under an existing debtor/creditor relationship.
Accordingly, this Court must grant summary judgment with regard to the Plaintiffs' retaliation claim as set forth in Count IV.
Breach of the Implied Covenant of Good Faith and Fair Dealing.
Count V of the Verified Complaint alleges a breach of contract and a breach of the implied covenant of good faith and fair dealing. The Plaintiffs allege that at all times they have complied with the terms and conditions of their contracts with Bank RI, and Bank RI breached by retaliating, declaring defaults, accelerating payments, and proceeding with foreclosure without any warning or valid reason. Further, it is alleged that Bank RI breached the implied covenant of good faith and fair dealing by refusing to grant Plaintiffs a reasonable forbearance for time to close on refinancing designed to pay Bank RI in full subsequent to Bank RI's declaration of default and acceleration. The Defendant argues in favor of summary judgment on the basis that there cannot be a stand-alone claim for breach of the implied covenant of good faith and fair dealing if the Borrowers were in breach of one or more of the financial covenants in the Agreement.
It is well established in Rhode Island that "virtually every contract contains an implied covenant of good faith and fair dealing between the parties." Dovenmuehle Mortgage, Inc. v.Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (quoting CentervilleBuilders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996)). This implied covenant exists between the parties to a contract so that the contractual objectives may be achieved. Ide Farm Stable,Inc. v. Cardi, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972) (citing Psaty Fuhrman v. Housing Auth., 76 R.I. 87,68 A.2d 32 (1949)); see also, Rhode Island Charities Trust v.Engelhard Corp., 109 F. Supp.2d 66, 73 (D.R.I. 2000) (holding that the implied covenant of good faith and fair dealing imposes a limitation upon one party adversely impacting the contract's value to the other party). While a claim for a breach of the covenant of good faith gives rise to a breach of contract claim, it does not give rise to an independent tort. A.A.A. Pool Serv. Supply Inc. v. Aetna Cas. Sur. Co., 121 R.I. 96, 99,395 A.2d 724, 726 (1978). The applicable standard in determining whether the implied covenant of good faith and fair dealing has been breached is "whether or not the actions in question are free from arbitrary or unreasonable conduct." Ross-Simons of Warwick,Inc. v. Baccarat, Inc., 66 F. Supp.2d 317, 329 (D.R.I. 1999);see Reid v. Key Bank of S. Maine, Inc., 821 F. 2d 9, 14
(1st Cir. 1987) (holding that good faith, under a subjective standard, is defined as "honesty in fact"). See also, U.C.C. § 1-201(20) ("Good faith," except as otherwise provided in Article 5, means honesty in fact and the observance of reasonable commercial standards of fair dealing).
In the circumstances of this case, Bank RI, by virtue of the covenants contained in the Master Loan Agreement, had the discretion to demand payment of all indebtedness if any event of default occurred. Certainly, Bank RI was not obligated to make demand for payment in full if there were a breach of a financial covenant in the loan documents, but retained the right to do so. The question raised by this motion for summary judgment is whether Bank RI, because it retained the right to declare default in the event of a covenant breach, is immune under all circumstances, as a matter of law, from a claim that it exercised that discretion in a manner inconsistent with the implied covenant of good faith and fair dealing.
Bank RI suggests that under Rhode Island law, in the absence of a breach of an express contractual provision, there can be no breach of the implied covenant of good faith and fair dealing. InA.A.A. Pool Serv. Supply Inc., supra, our Supreme Court clearly held that unfair denial of an insurance claim does not give rise to an independent tort claim for bad faith. Nothing in that case, however, stands for the sweeping proposition that a contracting party, having the discretion to exercise a contractual right, may do so in bad faith. Nor does the case ofIde Farm Stable, Inc., supra, foreclose the claims asserted herein by the Plaintiffs. While recognizing the relevance of the implied covenant of good faith and fair dealing, the Court simply upheld the trial justice's fact finding that no breach of the implied covenant was proven by the plaintiff under the facts of that case. Ide Farm Stable, Inc., 110 R.I. at 740,297 A.2d at 645.
Rather, there appears to be consistent recognition in commercial and banking jurisprudence that "[g]ood faith between contracting parties requires the party vested with contractual discretion to exercise it reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." Carrico v. Delp,141 Ill. App.3d 684, 690, 490 N.E. 2d 972, 976 (1986). Furthermore, exercise of a discretionary right under an agreement when used as a pretext for an effort to gain an improper advantage, or to thwart the reasonable expectations of the parties may also constitute a breach of the implied covenant of good faith and fair dealing. See Anthony's Pier Four, Inc. v. HBCAssociates, 411 Mass. 451, 473, 583 N.E.2d 806, 820 (1991);Southwest Sav. Loan Ass'n v. Sunamp Sys., Inc.,172 Ariz. 553, 559, 838 P.2d 1314, 1320 (1992). Merely because a party reserves the right to take action under a particular set of circumstances does not mean that there can never be a breach of the implied covenant, even if the discretion is exercised arbitrarily, by improper means, or for an improper purpose.[13]
The notes in question in this case were not demand notes,[14] but were term notes that required not only a determination by Bank RI that an event of default occurred, but that in light of the default the lender felt sufficiently insecure in the ability of the Borrowers to repay such that the loan must be "called." (Webber Aff. ¶ 16.) The facts and circumstances which led to exercise of that discretion are clearly in dispute. (Berger Aff. ¶ 15.) For instance, the Plaintiffs offer evidence that GKI's financial condition was stronger in 2005 than was reflected in the year end 2004 financial statements; that at least one of the covenant defaults existed at the time the loan originally closed; and that at least the question of whether there was a breach of one of the covenants is disputed.[15] (Gillette Suppl. Aff. ¶ 7; Meehan Aff. ¶¶ 5-7.) The extent of GKI's operating losses, liquidity, and Bank RI's security, and whether or not there was sufficient equity in the collateral to cover the loans also appears in question. (Tiernan Depo. at 92-93; Bilsky Aff. ¶ 4.) The timing and sequence of the loan workout process and the classification of the loan is also in dispute, especially as that process relates to the receipt of counsel's August 2005 claim letter. (Verified Complaint, ¶¶ 25, 27; Webber Aff. ¶¶ 16-18.) There is no dispute that the Borrowers were current on all payments, and that no event of payment default had ever occurred.
This Court may not resolve these disputed facts, or determine the reasonableness of Bank RI's actions on a motion for summary judgment. Bank RI maintains that the exercise of its rights to accelerate the indebtedness was contractually sound and reasonable under all of the circumstances. Plaintiffs maintain that the Bank RI's actions were unreasonable, retaliatory, and in derogation of the Borrowers' reasonable contractual expectations. These issues must be presented to the trier of fact for determination.
Accordingly, Defendant's motion for summary judgment as to Count V is denied.
 Conclusion
For the reasons stated herein, summary judgment as to Count III is denied, subject to the legal limitations set forth in this decision. Summary judgment as to Count IV is granted. Summary judgment as to Count V is denied.
The parties shall agree upon and submit an appropriate form of order reflective of this decision.
[1] GKI is a Rhode Island Corporation with its principal place of business in Exeter, Rhode Island. GKI is engaged in the sale of farm and garden equipment and supplies to farmers, landscapers and the general public from two retail locations in Exeter and South Kingstown, Rhode Island. Timothy J. Gillette is an individual who resides in Exeter, Rhode Island and is the president and sole shareholder of GKI.
[2] The Borrowers' allegations are contained in their Verified Complaint, and their opposition to this motion is supported by additional affidavits. For purposes of this motion for summary judgment, the facts alleged by the Plaintiffs must be accepted as true, since Plaintiffs are the parties opposing the motion. SeeGliottone v. Ethier, 870 A.2d 1022, 1027 (R.I. 2005) (citingSteinberg v. State, 427 A.2d 338, 340 (R.I. 1981)).
[3] The letter, addressed to Merrill W. Sherman as President and CEO of Bank RI, notified her of the Borrowers' claims against Bank RI for alleged violations of the ECOA and Regulation B in connection with the Borrowers' request for additional financing.
[4] Note 8 to the Accountant's Review Report for the GKI 2004 financial statements states: "[i]n addition, the Company must achieve a tangible net worth of not less than $10,000 by year end December 31, 2003 and $20,000 by year end December 31, 2004 and maintain that level as a minimum thereafter. The company did not meet these covenants due to the losses for 2003 and 2004." Seealso Meehan Aff. ¶ 4.
[5] "Completed application" is defined as "an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant. . . .)" See12 C.F.R. § 202.2(f).
[6] Deposition of Timothy Gillette, at 67-68, October 25, 2005 (hereinafter "Depo.").
[7] Business credit refers to extension of credit primarily for business or commercial (including agricultural) purposes. See12 C.F.R. § 202.2(g).
[8] GKI's financial statements for year end 2004 reveal that GKI is a business entity with gross revenues in excess of $1,000,000 per year. See Webber Aff. ¶ 15.
[9] It is undisputed that the Borrowers failed to request a written statement setting forth Bank RI's specific reasons for denying the additional business financing request pursuant to this section. Accordingly, Count III ¶ 47, claiming that Bank RI's failure to issue such a statement was in violation of the ECOA and Regulation B, cannot be supported.
[10] The Plaintiffs argue that their request for additional financing sought to establish a new credit arrangement, not further an existing arrangement. The Plaintiffs cite to Jochumv. Pico Credit Corp. of Westbank Inc., 730 F.2d 1041, 1045
(5th Cir. 1984), holding that an account is defined under § 202.2(a) as "an extension of credit." That court's focus was on the fact that the plaintiffs were attempting to establish a new credit relationship with the Bank, one that did not exist at the time of plaintiffs' application. Id. at 1045. The Court therefore characterized the Bank's adverse action as rejection of a new loan application, contrary to the facts in this case.
[11] "Applicant" is defined as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." See 15 U.S.C. § 1691a(b).
[12] Plaintiffs' expert, Harris Berger, attested in his expert opinion that Bank RI acted in an unreasonable, arbitrary, and unjustified manner that was contrary to their own policies and the norms of good banking practice. (Berger Aff. ¶ 15.) Even assuming these statements to be true, for purposes of this motion, they do not raise a genuine issue of material fact with regard to the retaliation claim, since such a claim must be for actions relating to an application for credit.
[13] Judge Seyla recognized this when he stated, "[c]eding discretion in a contract is not tantamount to subjecting oneself to legalized tyranny. Every contract contains an implied covenant of good faith and fair dealing. . . . Consequently, not even the reservation of absolute discretion can clear the way for a totally arbitrary and unprincipled exercise of a contracting party's power." Okmyansky v. Herbalife Int'l of Am., Inc.,415 F.3d 154, 158 n. 3 (1st Cir. 2005).
[14] Even those courts that have held that a duty of good faith and fair dealing may not be operable in a pure "demand loan" situation, have distinguished those situations where the demand is contingent upon an event of default leading the lender "in good faith" to believe its prospect of payment may be impaired.See Larson v. Vermillion State Bank, 567 N.W.2d 721, 723
(Minn.App. 1997); see also K.M.C. Co., Inc. v. Irving TrustCo., 757 F.2d 752, 760 (6th Cir. 1985) (a demand provision, "a kind of acceleration clause," is constrained by the same limitations of reasonableness and fairness as is a contractual provision granting one party the discretion of whether or not to advance funds under the terms of the contract.)
[15] See Thompson Trading, Ltd. v. Allied Breweries OverseasTrading, Ltd., 748 F. Supp. 936, 940, 942 (D.R.I. 1990) (holding that whether the plaintiff was in fact in default was unclear, therefore, the District Court determined that a jury question existed concerning whether the defendant's acts were reasonable in light of this lack of clarity).